[No. B080753. Second Dist., Div. One. Dec. 13, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ROSSO, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

COUNSEL

Hamar & Hamar, Richard A. Hamar and Maria Rivas Hamar for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson and Stephen M. Kaufman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ORTEGA, Acting, P. J.**—William Rosso appeals from the judgment entered following denial of his suppression motion (Pen. Code, § 1538.5) and

his negotiated guilty plea to possessing more than 10 kilograms of cocaine for sale. (Health & Saf. Code, §§ 11351, 11370.4, subd. (a)(3).) In the published portion of this opinion, we reject the People's argument that Rosso waived his appellate rights as part of his plea bargain, because there was no advisement of those rights before his purported waiver. In the unpublished portion of the opinion, we affirm the trial court's finding that Rosso and his companion validly consented to the house and auto search that disclosed the drugs, and affirm the judgment.[1]

## FACTS

About 9:45 p.m. on August 9, 1993, El Monte Police Detectives Gary Haidet, Victor Hernandez, Steve Schuster, and Keith Gee arrived at a common driveway servicing 2728 Pen Mar and two or three other houses. The officers were in plain clothes without raid gear or bulletproof vests. Haidet saw 16-year-old Luis Gilbert Sanchez walk down the driveway from the street to the side door of 2728 Pen Mar. A woman who lived in one of the other buildings told Haidet that Sanchez lived at 2728 Pen Mar. The detectives approached Sanchez, who confirmed he lived at 2728 Pen Mar, told him they were investigating narcotics activity at the house, and asked if he knew Rosso. Sanchez replied Rosso lived there with Sanchez's paraplegic mother Maria Gomez, and that the officers should speak with Gomez because she owned the house.

Haidet asked if he could enter to speak with Gomez. Sanchez replied he did not have a key, and discovered the door was locked. Sanchez knocked and asked to be admitted. Someone Haidet could not see unlocked and opened the door. Sanchez led the officers down a hall, where they could hear someone showering in the bathroom, to Gomez's bedroom. Gomez was in bed. Using Sanchez and Detective Hernandez as interpreters, Haidet explained why the officers were there. Gomez confirmed that Rosso lived there, owned a small red Chevy, and was showering in the bathroom. When Haidet asked to search the house and garage, Gomez orally consented, telling the deputies to search anywhere they wanted.

While the deputies spoke with Gomez, they heard the shower stop running and saw Rosso leave the bathroom with a towel around his waist. The officers identified themselves, told Rosso why they were there, walked him into the living room, where Rosso had left his clothes, and allowed him to

---

[1]Although the notice of appeal and appellate briefs spell Rosso's last name "Russo," the information, minute orders, and abstract of judgment use "Rosso." During his testimony at the suppression motion Rosso said his name was "William Rosso Sanchez."

Unless otherwise indicated, the facts are from the suppression hearing and all further statutory references are to the Penal Code.

dress. Rosso denied ownership or knowledge of, or possessing the keys to, a red Chevy Sprint with a particular license number. Shortly thereafter, Detective Hernandez translated a written Spanish consent to search form for Gomez, who signed it. The officers then looked around the rest of the house and determined no one else was inside.

The officers next went to the garage. The door was padlocked shut, but, looking under the door, Haidet saw vehicle tires inside. Haidet then completed another written consent to search form and asked Hernandez to explain it to Rosso. Rosso signed the form after Hernandez explained it to him. Haidet then asked Gomez if she had a key to the padlock. She replied Rosso probably did. The officers then cut the padlock, used a "slim jim" to open the locked car, and found 33 kilograms of cocaine, as well as Rosso's wallet, driver's license, credit cards, and other identification, inside. The officers then searched the house, and found a small amount of cocaine on a dish on the top of the closet in Gomez's bedroom, where Rosso sometimes slept, at a height inaccessible to Gomez when in her wheelchair.

Haidet described the investigation as low key, designed to avoid any use, threat, or display of force, and to maximize the likelihood of cooperation and consent. The officers never took out their guns, did not touch Sanchez or Gomez, never raised their voices or threatened anyone, and only handcuffed Rosso after discovering the cocaine in the car.

In defense, Sanchez, Gomez, and Rosso claimed the officers were wearing raid gear and bulletproof vests, had their guns drawn, grabbed Sanchez outside the house, yelled threats, handcuffed Rosso as soon as he emerged from the bathroom, hit him in the head with a flashlight, told him Sanchez and Gomez would be arrested unless he told them where the cocaine was, and searched the house and car before receiving oral or written consent from Gomez or Rosso. Rosso and Gomez claimed they signed the written consent forms only after the search and without reading or understanding them.

Also in defense, Jesus Espinoza, discovered through Rosso's *Pitchess* motion (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]), testified that, about two and one-half years before the incident, while he was eating in a parked car behind a closed Alcoholics Anonymous center between 12:30 and 1 a.m., Officer Hernandez, on patrol, asked him what he was doing there, threatened him, pulled him out of the car, struck him in the stomach with a baton, and told him to leave. Officer Hernandez said he did not remember the incident.

In denying Rosso's suppression motion, the trial court stated: "[I]t is a matter of credibility. I mention . . . Officer Hernandez' testimony parenthetically, it was not incredibly important, but it's something that causes

some minor concern. I'm looking basically at some type of logic and some type or understanding of what makes sense, given what has happened. I have problems, substantial problems, with credibility with all three defense witnesses. [¶] . . . ." [¶] But most importantly, [Rosso's] testimony was not credible. I think it's very clear he had a story to tell. He was intent on going on and on and telling the story that did not make a lot of sense. I find very little credibility, i[f] any, [in] his testimony. [¶] I find the testimony of the police officers to be credible. I do find there was a consent given by both Ms. Gomez and by [Rosso]. [¶] I furthermore find [Rosso] has no standing in the car that was searched. I do believe the statement that he denied all ownership and knowledge concerning the car. That being the case, he has no standing to later come in and say he wants to suppress the evidence taken from the car. So I do find consent and further find the defendant has lack of standing in the car."

## ISSUES

The People contend Rosso (I) waived his right to appeal as part of his plea bargain, and (III) received one day too many pretrial conduct credits. Rosso contends (II) the trial court erred in finding he lacked standing and that he and Gomez validly consented to the search of the car and house.

## DISCUSSION

### I

After Rosso's suppression motion was denied, he pled guilty in a negotiated plea agreement in which the People dismissed the 80-kilogram enhancement and added a 10-kilogram enhancement (Health & Saf. Code, § 11370.4, subd. (a)(3)). Rosso pled guilty for an agreed 13-year sentence, composed of a 3-year middle term for the possession for sale count and a consecutive 10-year term for the amended enhancement. The original enhancement carried a 25-year sentence.[2]

Before his plea, the trial court properly advised Rosso of his constitutional rights. (*Boykin* v. *Alabama* (1969) 395 U.S. 238, 242-244 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709]; *In re Moser* (1993) 6 Cal.4th 342, 351 [24 Cal.Rptr.2d 723, 862 P.2d 723], quoting *People* v. *Walker* (1991) 54 Cal.3d 1013, 1019-1020 [1 Cal.Rptr.2d 902, 819 P.2d 861]; *In re Tahl* (1969) 1

---

[2]Although the information alleged that Rosso possessed more than 80 kilograms of cocaine, it cited Health and Safety Code section 11370.4, subdivision (a)(4), a 20-kilogram enhancement, rather than subdivision (a)(6), the 80-kilogram enhancement. During the suppression motion, the officers testified they found 33 kilograms of cocaine in the car, and a small amount in the dish in Gomez's bedroom.

Cal.3d 122, 132-133 [81 Cal.Rptr. 577, 460 P.2d 449].) There was no mention of appellate rights. The following colloquy then occurred: "[The Court]: . . . Have you discussed these rights with your attorney? [¶] [Rosso]: Yes. [¶] The Court: Do you understand each and every one of these rights? [¶] [Rosso]: Yes, I understand. [¶] The Court: Do you waive and give up these rights *and your right to appeal*? [¶] [Rosso]: Yes, I waive them." (Italics added.) No further discussion occurred regarding appellate rights.

■ Defendants, like Rosso, whose pretrial suppression motions are denied, "may seek further review of the validity of a search or seizure on appeal from a conviction in a criminal case nothwithstanding the fact that the judgment of conviction is predicated upon a plea of guilty. . . ." (§ 1538.5, subd. (m).) However, the People argue that, in the colloquy quoted above, Rosso waived this statutory right to appeal the denial of his suppression motion. We disagree.

We agree with the People that defendants validly may waive appellate rights, which are statutory, not constitutional, generally (*People* v. *Vargas* (1993) 13 Cal.App.4th 1653, 1657-1663 [17 Cal.Rptr.2d 445]; *People* v. *Nguyen* (1993) 13 Cal.App.4th 114, 119-124 [16 Cal.Rptr.2d 490]), and specifically the statutory right to appeal the denial of a pretrial section 1538.5 motion (*People* v. *Kelly* (1994) 22 Cal.App.4th 533, 534-536 [27 Cal.Rptr.2d 383]; *People* v. *Castrillon* (1991) 227 Cal.App.3d 718, 721-722 [278 Cal.Rptr. 121]; *People* v. *Charles* (1985) 171 Cal.App.3d 552, 557-563 [217 Cal.Rptr. 402]). We also agree that such waivers, if made as part of plea bargains in which both parties receive some benefit, and after express advisement and waiver, promote finality of judgments and conserve scarce judicial resources. (See *People* v. *Olson* (1989) 216 Cal.App.3d 601, 604-605 [264 Cal.Rptr. 817].)

■ " 'Waiver is ordinarily a question of fact. [Citation.]' [Citation.] It is defined as '[a]n intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and the conduct of the accused.' [Citation.]

" '[T]he valid waiver of a right presupposes an actual and demonstrable knowledge of the very right being waived. [Citations.]' [Citation.] It ' "[i]s the intelligent relinquishment of a known right after knowledge of the facts." [Citation.]' The burden is on the party claiming the existence of the waiver to prove it by evidence that does not leave the matter to speculation, and doubtful cases will be resolved against a waiver. [Citation.] The right of appeal should not be considered waived or abandoned except where the

record clearly establishes it. [Citation.]" (*People* v. *Vargas*, *supra*, 13 Cal.App.4th at pp. 1661-1662.)

■ However, in this case, there was neither a written waiver form including an advisement and waiver of appellate rights, read, initialed, and signed by Rosso after discussion with his attorney, nor an oral advisement of his appellate rights. All of the cases cited above included one or both of those safeguards. Here, the trial court did not advise Rosso of his right to appeal generally, or of his specific right to appeal the denial of his pretrial section 1538.5 motion. While there was a purported waiver, there was no advisement, and we cannot say Rosso's waiver was knowing and intelligent. Thus, we reject the People's contention that Rosso waived his appellate rights.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Vogel (Miriam A.), J., and Masterson, J., concurred.

---

*See footnote, *ante*, page 1001.